UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
WILFREDO VARGAS and AMANDA
COLUCCIO VARGAS,

                 Plaintiffs,                                              MEMORANDUM AND ORDER
                                                                           15-CV-6981 (ILG) (RML)
      *v.*

APL LIMITED,
AMERICAN PRESIDENT LINES, LTD.,
APL MARITIME LTD.,
APL MARINE SERVICES, LTD.,
OSPREY SHIPMANAGEMENT INC.,
NEPTUNE ORIENT LINES LTD.,
NOL LINER (PTE) LTD.,
WILMINGTON TRUST COMPANY, as
Owner Trustee for the Benefit of NOL Liner
(PTE) LTD., and the M/V APL PEARL, her
engines, gear, tackle and cargo, *in rem*,

                 Defendants.[1]
------------------------------------------------------x
GLASSER, Senior United States District Judge:

      The Plaintiffs, Wilfredo Vargas (**"Wilfredo"** or **"Vargas"**) and his wife Amanda Coluccio Vargas (**"Amanda"**), allege that Wilfredo was injured while performing work as a lasher aboard the MV APL PEARL (the **"APL PEARL"** or the **"Vessel"**) while the ship was berthed at a marine terminal in Elizabeth, New Jersey in the early hours of May 6, 2014.[2]

---

[1] APL Limited was incorrectly sued herein as "APL Ltd." (ECF No. 11 (Answer) at 1). The Clerk of the Court is respectfully requested to amend the caption accordingly.

[2] It does not appear that this case has any connection to the Eastern District of New York, or the State of New York, except for the fact that Plaintiffs resided in Brooklyn at the time they filed their complaint (they have since moved to New Jersey). (Vargas Dep. at 21:20-21, 23:10-24:5). All of the events related hereto arose in the State of New Jersey, and all *in personam* Defendants are entities organized under the laws of Delaware or Singapore. In their answer, Defendants asserted lack of personal jurisdiction as an affirmative defense. (Answer ¶ 46). But they never moved for dismissal or summary judgment on this basis. Accordingly, the Court finds that this defense has been waived. *See Juliano v. Grand Hyatt New York, Inc.*, No. 3:17-CV-1080 (VAB),

1

Wilfredo brings a claim for negligence pursuant to Section 905(b) of the Longshore and Harbor Workers' Compensation Act (**"LHWCA"**), 33 U.S.C. § 905(b), and Amanda brings common law claims for loss of consortium, loss of services and loss of society.[3] Defendants are the APL PEARL and her engines, tackle, *in rem*, as well as several entities alleged to be affiliated with the APL PEARL. (ECF No. 1 (Compl.) ¶¶ 4-27).[4] Certain of the Defendants have moved for summary judgment on all claims. (ECF No. 34).[5] For the following reasons, the motion is granted in part and denied in part.

## STANDARD OF REVIEW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the case under governing law." *Fireman's Fund Ins. Co. v. Great American Ins. Co. of New York*, 822 F.3d 620, 631 n. 12 (2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute is genuine

---

2018 WL 1069578, at *3 (D. Conn. Feb. 27, 2018) ("[B]y filing [for summary judgment] on the merits, [the defendant] availed itself of this forum and waived any claim that this Court lacks personal jurisdiction over it"); *Azrelyant v. B. Manischewitz Co.*, 98-CV-2502 (ILG), 2000 WL 264345, at *5 (E.D.N.Y. Jan. 13, 2000).

[3] The parties have not briefed the question of whether New York or New Jersey law applies to Amanda's claims. Accordingly, the court does not wade into that question here.

[4] In their answer, Defendants dispute their affiliation with the APL PEARL. (Answer ¶¶ 4-14). Because none of Defendants' arguments for summary judgment hinge on the nature of their relationship with the Vessel, the Court may ignore this disagreement for purposes of the present motion. *See infra* n. 10.

[5] The Defendants that have moved for summary judgment are APL Limited, American President Lines, Ltd., APL Marine Services, Ltd., Neptune Orient Lines, Ltd., NOL Liner (Pte) Ltd., and Wilmington Trust Company, as owner trustee for the benefit of NOL Liner (Pte) Ltd. For the convenience of the reader, this opinion will refer to the aforementioned movant-defendants as the **"Defendants."**

'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Id.* (quoting *Anderson*, 477 U.S. at 248). "In making this determination, the Court 'must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.' " *Id.* (quoting *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. " 'The evidence of the non-movant is to be believed' to the extent that a jury could reasonably believe it." *Grant v. City of New York*, 15-CV-3635 (ILG) (ST), 2019 WL 1099945, at *4 (E.D.N.Y. Mar. 8, 2019) (quoting *Anderson*, 477 U.S. at 255). "Conversely, 'the court … must disregard all evidence favorable to the moving party that the jury is not required to believe.' " *Id.* (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)).

## BACKGROUND

Except where otherwise indicated, "a reasonable trier of fact, weighing the conflicting evidence and resolving all ambiguities and credibility determinations in Plaintiff[s'] favor, could infer that the following events transpired." *Grant*, 2019 WL 1099945, at *2.

At all relevant times, the APL PEARL was a U.S.-flagged cargo vessel. Containers on the APL PEARL are stacked in rows inside the hull of the ship. (Larkin Dep. at 25:4-7). These containers are secured with "lashings": metal rods that attach into the corners of the containers and are secured to turnbuckles that connect the lashing rods to metal fittings on the ship. (Larkin Dep. at 26:2-12; Pl. Ex. 6 (Muenzberg Decl.) ¶ 3). After the ship is docked and its containers are offloaded, new containers loaded onto the vessel must be lashed before the vessel goes back to

3

sea. (Muenzberg Decl. ¶ 4). In this case, the APL PEARL used a separate company, Maher Terminals LLC ("**Maher**"), to provide longshoreman services, and Maher subcontracted with American Maritime Services ("**AMS**") to provide lashing services. (Monaco Dep. at 9:12-14; 12:13-15, 25:16-26:2).[6] A mate of the APL PEARL must be on watch during cargo operations to ensure that the containers are properly lashed. (Muenzberg Decl. ¶ 6). If the mate sees that a lashing is missing or loose he will advise the lashers to fix it. (*Id.*; Monaco Dep. at 93:13-94:4, 96:8-15).[7]

At all relevant times, Vargas was employed by AMS as a lasher. (Def. Ex. I (Pl.'s First Amended Response to Defs.' Interrogatories) ¶ 2). On May 6, 2014, Vargas was lashing containers aboard the APL PEARL. The only other lasher aboard the APL PEARL at the time was Rui Azevedo ("**Azevedo**"). (Vargas Dep. at 205:17-20). Vargas' lashing foreman, Lenny Gonzalez ("**Gonzalez**"), was located in a van onshore. (*Id.* at 143:16-21). During cargo operations, a mate of the Vessel, who had been on the deck "telling everybody what to do" (*id.* at 171:5-6, 265:6-10), "pointed" to a container and "told" Vargas that it needed to be lashed (Vargas Dep. at 162:18-19; 174:21-23; 265:11-19). The container was located on a "pedestal" of the ship at least 10 or 12 feet high (*id.* at 164:18-21, 167:20-23), which could normally be accessed from below by climbing up a metal ladder that is welded to the ship and going through an access hatch. (Muenzberg Decl. ¶ 7; Monaco Dep. at 97:7-9). On this particular day, however,

---

[6] AMS and Maher have not been named as defendants herein. However, Maher has been sued by certain of the Defendants for indemnity and contribution. (ECF No. 12 (Third Party Compl.)). The third party action against Maher does not affect the disposition of the present motion for summary judgment.

[7] Defendants dispute whether the APL PEARL's crew ever issues instructions to the lashers. (Larkin Dep. at 122:17-21; Def. Ex. J (Fitzgerald Decl.) ¶¶ 4, 7). On summary judgment, these questions of fact must be resolved in Plaintiffs' favor. *See* Standard of Review, *supra*.

there was a container sitting on top of the hatch, blocking access to the pedestal. (Vargas Dep. at 164:3-4). Vargas told the mate that the hatch was covered and that he could not access the pedestal. (*Id.* at 162:19-24, 174:25-175:3). The mate reiterated that the container had to be lashed. (*Id.* at 162:24-163:2, 175:4-6). Vargas asked, "how do you propose I get up there?" (*Id.* at 163:2-3). The mate walked out of sight and, after less than a minute, came back and handed Vargas a straight, aluminum ladder, approximately eight to 10 feet in length. (*Id.* at 163:3-5; 175:7-9, 175:23, 187:8-188:2, 266:5-7). The mate then "walked away," leaving Vargas by himself. (*Id.* at 163:8-9, 194:6-11, 266:23-25).[8]

It is undisputed that, if the access hatch were closed, the "only way" to access the pedestal would be to use a ladder. (Larkin Dep. at 75:18-22). Vargas leaned the ladder against the steel wall of the pedestal and climbed up. (Vargas Dep. at 163:9-12). But after he had ascended about three-quarters of the way, the ladder "kicked up" and "slid out underneath" him. (*Id.* at 163:12-17, 199:23-24). Vargas fell flat-footed onto his right leg, which was "crushed" from the impact, and Vargas "scream[ed] in pain." (*Id.* at 210:7-11, 211:13-14, 216:13-15). Azevedo came to render assistance, followed by Gonzalez, and Vargas was taken to the hospital.

---

[8] Defendants dispute that this interaction between Vargas and the mate ever occurred. They produce a sworn declaration by Sean Fitzgerald, the APL PEARL's mate, denying any recollection that he provided a portable ladder to a lasher. (Fitzgerald Decl. ¶ 3). Defendants also challenge Vargas' credibility, pointing to several purported discrepancies in his testimony. For instance, Vargas testified that the mate wore "white" (Vargas Dep. at 173:10-174:6), but vessel's chief mate, Thomas Larkin, testified that mates on duty did not wear white (Larkin Dep. at 135:4-6). Vargas also testified that the ladder was gray and did not have markings on it (Vargas Dep. at 188:6-20, 189:2-3), but Larkin and Fitzgerald both stated that the APL PEARL's ladders were bright orange and had the name of the vessel marked on the side (Larkin Dep. at 132:21-133:7; Fitzgerald Decl. ¶ 9). These contradictions, however, do not make Vargas an incredible witness as a matter of law. On summary judgment, any questions of fact concerning the veracity of Vargas' testimony must be resolved in his favor. *See* Standard of Review, *supra*.

(*Id.* at 211:2-212:11; Def. Ex. I ¶ 3). Gonzalez prepared an injury report documenting the accident. (Pl. Ex. 4 (AMS Accident Report)).[9]

At all relevant times, the APL PEARL had written ladder safety procedures requiring that ladders be inspected and lashed down before each use and that an additional person tend to the ladder while another person is climbing. (Larkin Dep. at 141:4-17; Pl. Ex. 9 (Ladder Safety Policy)). In addition, the ship's written safety policies required safety harnesses to be worn "by any person working in a position where they may fall 2 meters or more." (Pl. Ex. 10 (Safety Harness Policy)). There is no evidence that the mate assisted Vargas in taking of these precautions before "walk[ing] away" from the situation.

Nor did Vargas himself take any precautions. Vargas conceded that he did not inspect the ladder before using it (*id.* at 191:20-22, 197:16-21, 198:10-12), such as by checking the bottom of the ladder to see if it had rubber feet (*id.* at 200:10-24). When asked why he did not inspect the ladder, he replied, "Because I had to get the job done." (*Id.* at 191:25-192:3). Vargas did not investigate any secure points or attempt to secure the ladder. (*Id.* at 192:25-193:14). He did not barricade the ladder or tie it with some line. (*Id.* at 195:4-6, 204:14-18). He did not use fall protection (*id.* at 177:24-178:12), although AMS had harnesses available that he could have asked for (*id.* at 178:13-25). Finally, Vargas did not ask for help from Gonzalez, Azevedo, or any of the other lashers onshore. (*Id.* at 201:23-205:25).

---

[9] The injury report reflects a "Date of Injury" of May 5, 2014 and a time of injury of 1:45 a.m. (Pl. Ex. 4). This was likely a scrivener's error as the injury occurred on May 6, 2014.

6

# DISCUSSION

## I. Section 905(b) of the Longshore and Harbor Workers' Compensation Act

The LHWCA establishes a comprehensive federal workers' compensation program for longshoremen who suffer from qualifying injuries. Section 905(b) sets forth circumstances in which the vessel may be held liable for a worker's injuries. It provides, in relevant part:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party …. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

33 U.S.C. § 905(b). "Thus, in the typical tripartite situation" between a longshoreman, his independent stevedore-employer, and the vessel, "the longshoreman … may … recover tort damages if he can prove negligence by the vessel." *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 530 (1983).[10] Importantly, the contributory negligence of the longshoreman will not bar recovery, though his comparative fault may be considered in mitigation of damages. *See O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 66 (2d Cir. 2002).

## II. Duties of a Vessel Under § 905(b)

The LHWCA uses the term "negligence" but does not define it. 33 U.S.C. § 905(b). The Supreme Court has filled in this gap by "outlin[ing] … three general duties shipowners owe to

---

[10] The LHWCA defines the term "vessel" to mean the vessel itself "and said vessel's owner, owner pro hac vice, agent, operator, charter [*sic*] or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21). Because the mate in this case was an "officer" or "crew member," the Vessel may be held liable for his negligence. In their answer, Defendants dispute whether certain Defendants fall under the LHWCA's definition of "vessel." (Answer ¶¶ 4-14). *See supra* n. 4. However, because they do not raise this argument in their motion papers, the argument is waived for summary judgment purposes. *See Velez v. Reynolds*, 325 F.Supp.2d 293, 315 n. 13 (S.D.N.Y. 2004). In any event, Defendants concede that at least one Defendant, APL Marine Services Ltd., was the bareboat charterer and "operated, maintained and controlled" the Vessel. (Compl. ¶¶ 22-23; Answer ¶ 13).

longshoremen," sometimes called "*Scindia* duties," the breach of which gives rise to a right of action under § 905(b). *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98 (1994); *Gravatt v. City of New York*, 226 F.3d 108, 120-121 (2d Cir. 2000), *cert. denied*, 532 U.S. 957 (2001); *see Scindia Steam Nav. Co., Ltd. v. De Los Santos*, 451 U.S. 156 (1994). These duties are "not necessarily" coextensive with those owed by landowners under traditional tort precepts. *Scindia*, 451 U.S. at 168 n. 14. Instead, they establish a "federal common-law" governing the duties of vessels to longshoremen who are injured aboard. *O'Hara*, 294 F.3d at 64.

The first *Scindia* duty, known as the "turnover duty," *Howlett*, 512 U.S. at 98 (citing *Scindia*, 451 U.S. at 167), requires the vessel to "exercise 'ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety.' " *Gravatt*, 226 F.3d at 120-121 (quoting *Scindia*, 451 U.S. at 167). The second duty, known as the "active control duty," "provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the 'active control of the vessel.' " *Howlett*, 512 U.S. at 98 (quoting *Scindia*, 451 U.S. at 167); *Gravatt*, 226 F.3d at 121. The third duty, known as the "duty to intervene," provides that "the vessel owner must intervene if it acquires actual knowledge that … a condition of the vessel or its equipment poses an unreasonable risk of harm and … the stevedore is not exercising reasonable care to protect its employees from that risk." *Gravatt*, 226 F.3d at 121 (citing *Scindia*, 415 U.S. at 175-176); *see Howlett*, 512 U.S. at 98.

Here, only the second and third *Scindia* duties—the active control duty and the duty to intervene—concern us.[11]

## III. Active Control Duty

To establish that the Vessel is liable for breaching its active control duty, Plaintiffs must establish (i) that the duty was triggered, (ii) that it was breached, and (iii) that the breach proximately caused Vargas' injuries. *See Trueba v. Flota Bananera Ecuadorian Lines, Inc.*, 675 F.Supp. 786, 788 (S.D.N.Y. 1987) (noting that, in an action under § 905(b), "the plaintiff bears the burden of establishing four elements: duty, breach, causation, and damage").

1. <u>Whether the active control duty was triggered</u>

The Second Circuit has described the scope of the active control duty as follows:

> [O]nce stevedoring operations have begun, the vessel will be liable "if it actively involves itself in the cargo operations and negligently injures a longshoreman." *Scindia*, 415 U.S. at 167, 101 S.Ct. 1614 []. A passive vessel owner has no ongoing duty to supervise or inspect the stevedore's work—absent contractual, regulatory or customary obligations to the contrary. *See id.* at 172, 101 S.Ct. 1614. However, even where the vessel does not actively involve itself in stevedoring operations, it may be liable "if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Id.* at 167, 101 S.Ct. 1614 [].

*Gravatt,* 226 F.3d at 121 (emphasis omitted).

Hence, the active control duty is triggered where the vessel (i) "actively involves itself" in the stevedore's "*operations*," (ii) exercises "active control" over the "*equipment*" used by the longshoremen, or (iii) exercises "active control" over the "*areas*" where the longshoremen are

---

[11] Plaintiffs' opposition papers do not respond to Defendants' contention that the Vessel did not violate its turnover duty (ECF No. 35-12 (Pl. Mem.) at 4), so any such claim is abandoned, *see Taylor v. City of New York*, 269 F.Supp.2d 68, 75 (E.D.N.Y. 2003), *order clarified*, 2003 WL 21781941 (E.D.N.Y. Jul. 29, 2003).

working. *Id.* (emphasis added); *see also Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532, 540 (3d Cir. 1993); *In re Knudsen*, 710 F.Supp.2d 1252, 1271 (S.D. Ala. 2010) (citing Thomas J. Shoenbaum, Admiralty & Maritime Law § 7-10 (4th ed. 2010)).

As to the "operations" prong, courts have consistently held that the active control duty is triggered when the vessel orders longshoremen to engage in specific stevedoring tasks. *See, e.g., O'Hara*, 294 F.3d at 66-67; *Rivera v. Arctic Ocean Shipping Ltd.*, No. 09-CV-4672 (CBA) (JMA), 2012 WL 1004840, at *7 (E.D.N.Y. Mar. 23, 2012). For instance, in *O'Hara,* the plaintiff was injured after an employee of the vessel ordered him to recover certain steel partitions that had fallen into the water. *See* 294 F.3d at 60. Because of the weight of the partitions, a crane would normally be used to lift them, but because the crane was broken, the plaintiff was ordered to lift the partitions by hand. *See id.* The record, viewed in the light most favorable to the plaintiff, also established that the vessel employee was aware of the risks posed by this operation. *See id.* at 66. The Second Circuit held that the plaintiff's claim that the vessel violated its active control duty withstood summary judgment. *See id.* at 66-67.

Similarly, in *Rivera*, the plaintiff was injured while overhauling the engine of a ship while it was at sea. *See* 2012 WL 1004840, at *1. High waves and strong winds on the day in question caused the ship to roll. *See id.* at *2. The plaintiff claimed that a vessel employee ordered him to transport a piston on a small cart. *See id.* When the ship rolled, plaintiff was struck by both the cart and the piston, injuring him. *See id.* The court held that a jury could find that the vessel employee knew or should have known that this task was unreasonably dangerous. *See id.* at *7. Accordingly, the court found that the evidence was sufficient at the summary judgment stage to find that the vessel breached its active involvement duty. *See id.* at *7.

As to the "equipment" prong, *Dickerson v. M/V PROLIV VILKITSKOGO*, No. 2:04-CV-23258 (PMD), 2007 WL 1499753 (D.S.C. Jan. 5, 2007), is instructive. In that case, longshoremen were engaged to assist with loading a number of boxes onto the vessel. *See id.* at *1. "Per the request of the Vessel's officers or crew members," the boxes were unloaded in a way that blocked access to a ladder welded to the ship. *Id.* Because the ladder was blocked, crew members set up a portable ladder for the longshoremen to use. *See id.* The plaintiff was injured while climbing the ladder. *See id.* The ladder was missing rubber feet, and no crew members were present to tend to the ladder while the longshoremen were using it. *See id.* The court denied summary judgment on plaintiff's claims; although "no crew members of the Vessel were in the vicinity … at the time of [p]laintiff's accident," the plaintiff "produced evidence that the Vessel's crew members or officers told [the longshoremen] how to load the cargo" and "placed the portable ladder" in the hatch. *Id.* at *5. This evidence, if true, raised a "genuine issue of material fact … as to whether [d]efendants actively controlled the portable ladder." *Id.*

In the case *sub judice,* Vargas testified that a mate of the Vessel "pointed" to a container on an elevated pedestal and "told" him to lash it. When Vargas asked how to reach the pedestal, the mate handed him a ladder. The record establishes that using the ladder would have been the only way to reach the pedestal. Although Vargas did not testify that the crewmember explicitly told him to use the ladder, a reasonable factfinder could interpret the crewmember's actions as a non-verbal command to use it. This control by a crewmember "over the actual methods and operative details" of the lasher's work is the very essence of the active control duty, *Price v. Atlantic Ro-Ro Carriers*, 45 F.Supp.3d 494, 508 (D. Md. 2014) (quoting *Clay v. Daiichi Shipping*, 74 F.Supp.2d 665, 673 (E.D. La. 1999)), and firmly situates this case within the precedents set under *O'Hara*, *Rivera* and *Dickerson*.

Defendants rely heavily on *Fontenot v. U.S.*, 89 F.3d 205 (5th Cir. 1996) and *Miller v. Navalmar (UK) Ltd.*, No. 4:13-CV-239 (WTM) (GRS), 2016 WL 1322439 (S.D. Ga. Mar. 31, 2016) to argue that no active control duty was triggered here. (ECF No. 34-13 (Def. Mem.) at 18-20; ECF No. 38 (Def. Reply) at 5). Both cases are distinguishable.

In *Fontenot*, the plaintiff slipped on a slick of oil and water that was left on a hatch cover. *See* 89 F.3d at 207. The vessel owner (the United States government in this case) "maintained no crew aboard the vessel," although four government employees were working from an office located onshore. *Id.* at 207-208. The plaintiff was "supervised" by his stevedore-employer and "was not subject to direction by others." *Id.* at 207. The plaintiff's evidence established that on a few isolated occasions, the government employees had issued directions to him, such as asking him to "straighten a crooked steering wheel" and to keep "coffee cups" and "cigarette butts … out of engine spaces." *Id.* There was no evidence that these menial tasks bore a causal connection to the injury that the plaintiff sustained when he fell on the hatch cover. The Court held that the vessel had no liability under the active control duty. *See id. Fontenot* thus involved a factual scenario quite different from *O'Hara* or *Rivera* (or this case), where the vessel instructed a longshoreman to engage in a specific stevedoring task that caused his ultimate injury.

*Miller* is even more inapposite. In that case, the plaintiff claimed that the vessel's active control duty was triggered because it had maintained "written procedures" concerning the loading operations that took place. 2016 WL 1322439, at *4. The court held that the maintenance of such written procedures did not trigger the duty in the absence of any evidence that the vessel was "actively involved in the cargo operations." *Id.* at *5. *Miller* simply lacks any relevance to the case at hand.

Defendants also rely on *Cole v. Noble Drilling Corp.*, No. 1:05-CV-479 (HSO) (JMR), 2007 WL 2475944 (S.D. Miss. Aug. 28, 2007), *aff'd*, 288 Fed. Appx. 931 (5th Cir. 2008) for the proposition that if a "vessel relinquishes control over an area *or a piece of equipment* to the stevedore, the active control duty is extinguished." (Def. Mem. at 22 (quoting *Cole*, 2007 WL 2475944, at *11 (emphasis added); Def. Reply at 4). The reference to "equipment" is dicta, as *Cole* did not concern the vessel's control or relinquishment of any equipment. In any event, the case involved very different facts. The plaintiff in *Cole* fell in a stairwell in an area under the control of the stevedore. *See* 2007 WL 2475944, at *1. The court found that the active control duty was not breached. Importantly, there was "no evidence … that [d]efendant maintained control of operative details of the work." *Id.* at *11; *see also Pimental v. LTD Canadian Pacific Bul*, 965 F.2d 13 (5th Cir. 1992); *cf. Dickerson*, *supra*.

Finally, Defendants urge the Court to discredit Vargas' deposition testimony altogether based on apparent contradictions between his account and those of Defendants' witnesses. (Def. Reply). *See supra* n. 8. Defendants appear to endorse the rule that summary judgment may be entered against a plaintiff if the only evidence substantiating his claim is his own "self-serving testimony." (Def. Reply. at 2). It goes without saying that this heavy-handed standard of review would knock out a great many valid claims. Oftentimes, the victim of a tort or other wrong will be the only one available to testify to the wrongdoing. Summary judgment procedure was not designed to preclude liability in these cases as a matter of law.[12]

---

[12] *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), cited by Defendants, is not to the contrary. *Jeffreys* held that summary judgment may be granted where the plaintiff's testimony is " 'so replete with inconsistencies and improbabilities' that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Id.* at 555; *see also Matheson v. Kitchen*, 515 Fed. Appx. 21, 23 (2d Cir. 2013) (summary order) (noting that "[t]he facts in *Jeffreys* … were extreme"). In this case, the Court is not presented with a plaintiff

13

For these reasons, the Court finds that Vargas has raised a genuine issue of fact as to whether the Vessel's active control duty was triggered.

2. <u>Whether the active control duty was breached</u>

It is not enough for Vargas to establish that the Vessel's active control duty was triggered; he must also establish that this duty was breached. *See DeBiase v. Cat Island Shipping, Ltd.*, No. 07-CV-3057 (JG) (MDG), 2009 WL 3077193, at *9 (E.D.N.Y. Sept. 25, 2009) ("Liability is not triggered by active involvement alone, but by active involvement that is negligent"). A vessel breaches this duty where it fails to "exercise reasonable care" to prevent injury to the longshoreman. *Howlett*, 512 U.S. at 98.

Reasonableness is, of course, a "fluid concept." *Keller v. U.S.*, 38 F.3d 16, 25 (1st Cir. 1994). It generally requires the trier of fact to "balanc[e] the usefulness … of the allegedly dangerous condition and the burden involved in curing it against the probability and severity of the harm it poses." *Id.* (citations, quotation marks, emphasis, and alterations omitted); *see also United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947) (Hand, J.), *reh'g denied*, 160 F.2d 482 (2d Cir. 1947). Reasonableness may also be informed by custom and practice within the maritime industry, although such considerations are not necessarily dispositive of the matter. *See Keller*, 38 F.3d at 25; *Evans v. Transportacion Maritime Mexicana*, 639 F.2d 848, 856 (2d Cir. 1981). Because of the lack of bright line rules defining whether a vessel's conduct is "reasonable" once one of the *Scindia* duties has been triggered, the question is generally ill-suited for disposition on summary judgment. *See Rivera*, 2012 WL 1004840, at *8 ("To the

---

whose testimony was internally inconsistent. Rather, the Court has the self-serving testimony of a plaintiff, contradicted only by the equally self-serving statements of the Vessel's crew.

14

extent Defendants seek summary judgment on the issue of negligence, that question is generally for the jury").

In this case, there is no evidence that using a ladder to access the pedestal was inherently unsafe or unreasonable (Def. Ex. F (Bergin Decl.), at Ex. A, p. 8 ¶ 3 ("There was nothing wrong with using a ladder to access the pedestal if normal access points were blocked….")).[13] But the evidence, viewed in the light most favorable to Plaintiffs, could show that it was unreasonable for the mate to ask Vargas to use the ladder without following the ship's safety protocols. In particular, Capt. Joseph Ahlstrom and Capt. Darrin Muenzberg opine that the mate should have inspected the ladder and ensured that the ladder was lashed down, that fall protection was used, and that another person tended to the ladder while Vargas was climbing. (Pl. Ex. 5 (Ahlstrom Decl.) ¶¶ 11-13; Muenzberg Decl. ¶ 9). This conclusion is vigorously disputed by Defendants,[14] but on summary judgment, the only question is whether a reasonable factfinder could credit the Plaintiffs' witnesses. The Court finds that they could.

---

[13] Plaintiffs allege that the ladder was "defective" and "did not have rubber feet." (Compl. ¶ 35). At his deposition, when asked why the ladder slid, he replied, "I guess aluminum against steel." (Vargas Dep. at 199:19). However, he testified that he did not inspect the ladder and never personally observed whether the ladder had rubber feet. (*Id*. at 191:20-22, 200:10-24, 231:10-11). According to Vargas, it was not until after the accident that a "coworker" told him that the "ladder didn't have any bottoms to it." (*Id.* at 231:8-17). Other than this hearsay statement from Vargas' "coworker," whose deposition or declaration has not been produced, there is no direct evidence that the ladder lacked rubber feet or was otherwise defective.

[14] Capt. John Bergin and Walter Curran opine that the ship's safety policies do not apply where equipment is furnished to a non-crewmember lasher, and that even if the mate gave Vargas a ladder, it was reasonable for the mate to rely on the stevedore's skill and expertise to ensure that the ladder were operated safely. (Bergin Decl. at Ex. A, pp. 3 ¶ 3 ("If a mate were to give any equipment to a lasher it is not the custom of the industry or the responsibility of the mate to then supervise the method in which the equipment is used"), 6-7 ¶ 10, 7 ¶ 1, 7-8 ¶ 3; Def. Ex. G (Curran Decl.), at Ex. A, pp. 9-11). In addition, Chief Mate Larkin testified that a mate would "not necessarily" be required to inspect a ladder before providing it to a longshoreman. (Larkin Dep. at 127:5-7).

Defendants contend that Plaintiffs cannot rely on the ship's own safety procedures to establish that the Vessel acted negligently. (Def. Reply at 11-12). Specifically, Defendants argue "that a ship's internal safety manuals … do not create duties running from the vessel to the longshoremen in excess of those set out in § 905(b), [as interpreted by] *Scindia* and *Howlett*." (*Id.*). While this proposition is correct as a matter of law, Defendants misunderstand its relevance to the case at bar by confusing the elements of duty and breach. It is true that the only duties running from the vessel to the longshoreman are those set out in *Scindia* and its progeny: that is, the turnover duty, the active control duty, and the duty to intervene. A vessel's internal safety protocols do not independently create a duty actionable under § 905(b). *See, e.g., Horton v. Maersk Line, Ltd.*, 603 Fed. Appx. 791, 796-797 (11th Cir. 2015) (unpublished) (holding that there is no general duty for the "ship owner to supervise the stevedore," notwithstanding safety manual requiring supervision of cargo loading). But once it has been established that the vessel's duties under *Scindia* have been triggered, as they have here, *see* Discussion III.1, *supra*, there is no reason why a vessel's policies cannot be relevant to a determination of whether the crew failed to exercise "reasonable care" under the circumstances, *Howlett*, 512 U.S. at 98. In this case, a factfinder could conclude that the Vessel's safety policies are evidence of the requirements of good seamanship generally, and that a failure to adhere to them was therefore unreasonable.

For these reasons, the Court finds that Plaintiffs have raised a genuine issue of fact as to whether the mate acted unreasonably and, hence, whether the Vessel breached its duty.

3.   Whether the Vessel's breach proximately caused Vargas' injury

In order to prevail on a claim under § 905(b), the plaintiff must show that the vessel's negligence proximately caused his injuries. *See Trueba*, 675 F.Supp. at 789-790. There is no

16

genuine dispute that the mate's conduct (as testified to by Vargas), and in particular his failure to follow the ship's safety protocols, was causally connected to Vargas' ultimate injury. The only significant question is whether Vargas' *own* failure to follow proper safety procedures broke the causal chain. As previously mentioned, there were a number of measures Vargas could have taken after the mate "walked away" to reduce the risk of injury, such as, for example, checking to see whether the ladder could be secured, using fall protection, or asking for help from his fellow lashers. Vargas agreed at his deposition that "there were several things that [he] could have done to avoid [the] accident." (Vargas Dep. at 206:2-5).

Close attention must be paid to the distinction between a plaintiff's *contributory negligence*, *i.e.*, negligence concurrent with that of the defendant, and negligence that amounts to a *superseding cause* of the plaintiff's injuries. Congress rejected the doctrine of pure contributory negligence in favor of comparative fault when it adopted the LHWCA. *See O'Hara*, 294 F.3d at 66. Accordingly, a plaintiff's negligence, where a concurrent cause of his injuries, will not provide a complete defense to liability. However, because the LHWCA continues to incorporate the traditional notion of proximate cause, negligence by the plaintiff may preclude liability where it breaks the chain of proximate causation between the defendant's negligence and the plaintiff's ultimate harm. Courts have consistently held that the notion of superseding cause continues to apply in § 905(b) actions, notwithstanding the statute's rejection of the contributory negligence principles. *See Hill v. Reederei F. Laeisz G.M.B.H., Rostock*, 435 F.3d 404, 416 (3d Cir. 2006), *cert. denied*, 549 U.S. 820 (2006); *Koch v. U.S.*, No. 13-CV-205 (SM) (JCW), 2015 WL 4129312, at *6 (E.D. La. Jul. 7, 2015); *Sumptor v. M/V ATHOS*, No. 06-CV-641 (MH), 2008 WL 11388471, at *4 (S.D. Tex. Apr. 22, 2008); *Bourda v. Seacor Marine, Inc.*, No. 00-CV-2459 (KDE), 2002 WL 10458, at *2 (E.D. La. Jan. 2, 2002); *see also Exxon Co., U.S.A. v. Sofec, Inc.*,

517 U.S. 830, 837 (1996) ("[T]here is [no] repugnancy between the superseding cause doctrine, which is one facet of the proximate causation requirement, and a comparative fault method of allocating damages").

In determining whether an event was a superseding cause of a plaintiff's injuries under § 905(b), federal courts have applied the approach taken in the Restatement (Second) of Torts (1965). *See Hill*, 435 F.3d at 417-418; *Sumptor,* 2008 WL 11388471, at *4. The Restatement sets forth six factors to be taken into consideration in determining whether an intervening force is a superseding cause of injury, of which two are particularly relevant here: "(a) the fact that its intervention brings about a harm different in kind from that which would otherwise have resulted from the actor's negligence[,] [and] (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation[.]" Restatement (Second) of Torts § 442. Importantly, the mere fact that the plaintiff acted negligently will not break the chain of legal cause if the plaintiff's negligence itself was foreseeable to the defendant. *See Bourda*, 2002 WL 10458, at *2; *see also Greenfield v. Suzuki Motor Co. Ltd.*, 776 F.Supp. 698, 701 (E.D.N.Y. 1991) (applying New York law); *McMinn v. Consolidated Rail Corp.*, 716 F.Supp. 125, 128 (S.D.N.Y. 1989) (applying New Jersey law).

Applying the Restatement's approach to the facts at hand would permit a rational trier of fact to conclude that Vargas' negligence, if any, was a concurrent rather than superseding cause of his injury. The type of harm that ultimately befell him—injury from falling from the ladder—is precisely the type of risk that was aggravated by the mate's breach of his duty. In addition, a trier of fact could determine that, even if it was negligent for Vargas to use the ladder handed to him without taking any extra precautions, his negligence was entirely foreseeable to the mate

18

under the circumstances. *See Greenfield*, 776 F.Supp. at 701 ("what is foreseeable for purposes of establishing intervening cause is generally a question for the finder of fact") (citing *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315, 414 N.E.2d 666, 670-671 (N.Y. 1980)).

For these reasons, Plaintiffs have raised a genuine issue of fact as to causation.

4. <u>Conclusion regarding the active control duty</u>

Plaintiffs have raised a genuine issue of material fact as to whether Defendants are liable under an active control duty theory. Accordingly, Defendants' motion for summary judgment is denied as to this portion of Plaintiffs' claim.

**IV.     Duty to Intervene**

Although summary judgment is denied as to the active control duty, it is granted as to the duty to intervene. To establish that the Vessel breached its duty to intervene, Plaintiffs must show that the Vessel "acquire[d] *actual knowledge* that (1) a condition of the vessel or its equipment poses an unreasonable risk of harm and (2) *the stevedore is not exercising reasonable care to protect its employees from that risk*." *Gravatt*, 226 F.3d at 121 (emphasis added) (citing *Scindia*, 415 U.S. at 175-176). In this case, there is no evidence that the stevedore, AMS, failed to exercise reasonable care to prevent the type of injury that occurred. *A fortiori*, there is no evidence that the Vessel had "actual knowledge" of any such failure. To the contrary, Vargas testified that there was another lasher on the ship and still more onshore; no evidence has been given suggesting that these lashers would have been unavailable to assist Vargas if needed. He also testified that AMS had harnesses available for use.

19

Because Plaintiffs have failed to raise a genuine issue of material fact as to Defendants' liability based on a duty to intervene, summary judgment is granted as to this portion of Plaintiffs' claim.

## V. Loss of Services, Loss of Consortium and Loss of Society

Wilfredo Vargas's wife, Amanda, seeks damages for loss of services, loss of consortium and loss of society. Defendants raise no grounds for granting summary judgment as to Amanda's claims that are not derivative of their arguments as to Wilfredo's § 905(b) claim. (Def. Mem. at 1 n. 1). Because summary judgment is denied, in part, to Wilfredo's claim, it is denied as to Amanda's claims as well.

## CONCLUSION

Defendants' motion for summary judgment is **GRANTED** as to Wilfredo Vargas' claim for breach of the turnover duty; **DENIED** as to Wilfredo Vargas' claim for breach of the active control duty; **GRANTED** as to Wilfredo Vargas' claim for breach of the duty to intervene; and **DENIED** as to Amanda Coluccio Vargas' claims.

SO ORDERED.

Dated: Brooklyn, New York
May 1, 2019, 2019

/s
I. Leo Glasser                    U.S.D.J.